UNITED STATES of America,
Plaintiff–Appellee,

v.

Albert J. DeSANTIS, Defendant–
Appellant.

No. 96–4289.

United States Court of Appeals,
Sixth Circuit.

Argued July 31, 1997.

Decided Jan. 20, 1998.

Rehearing Denied March 3, 1998.

Randall E. Yontz (argued and briefed), Office of the U.S. Attorney, Columbus, OH, for Plaintiff–Appellee.

Dennis C. Belli (argued and briefed), Columbus, OH, for Defendant–Appellant.

Before: NELSON and RYAN, Circuit Judges; QUIST, District Judge.*

RYAN, J., delivered the opinion of the court. NELSON, J. (p. 770), delivered a separate opinion concurring in the judgment and in all but Part II A, in which QUIST, D. J., joined.

RYAN, Circuit Judge.

## OPINION

Defendant Albert J. DeSantis appeals from the judgment entered on a jury verdict convicting him of five counts of mail fraud, in violation of 18 U.S.C. §§ 2 and 1341; and one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 18 U.S.C. § 2, and 17 C.F.R. § 240.10b–5, all arising out of allegedly fraudulent misrepresentations and omissions made in selling interests in a limited partnership, through a broker, to 28 investors. DeSantis also appeals from the sentence imposed.

---

* The Honorable Gordon J. Quist, United States District Judge for the Western District of Michi-

The defendant complains that, as a consequence of a number of evidentiary, procedural, and instructional errors committed by the trial judge, he was denied a fair trial. We agree and therefore the judgment of conviction must be reversed.

## I.

## BACKGROUND AND PROCEDURAL HISTORY

In 1988, defendant DeSantis owned several buildings near the campus of Ohio State University, in Columbus, Ohio, as well as the businesses housed in the buildings—primarily bars. DeSantis and an associate, Michael Hobbs, formed Campus Business Limited Partnership, or CBLP, a syndication of the bars, and they offered interests in the limited partnership to investors. These interests were sold between 1989 and 1991 by Lawrence Durbin, a certified financial planner and securities salesman. To assist Durbin in soliciting potential investors, DeSantis supplied Durbin with a Private Placement Memorandum, or PPM, describing the businesses, their principals, and the risk factors associated with the offering. Each investor was required to sign a subscription agreement acknowledging receipt of the PPM, certifying that the investor was accredited, and noting the high risk associated with CBLP and its illiquidity.

The PPM indicated that Durbin would receive a 10% commission on the sale of all CBLP shares. Evidence adduced at trial revealed, however, that Durbin received additional payments—not disclosed to investors—equal to another 10%. DeSantis maintains the extra payments were not commissions, and were not paid out of CBLP funds, and therefore did not materially affect the value of the offering. Both Durbin and Hobbs confirmed at trial that Durbin received this additional 10% from DeSantis and Hobbs personally, and not out of CBLP funds. The government acknowledges this point, but argues that the routing of the money through personal accounts does not

gan, sitting by designation.

change the fact the money originated with the investors. In support of this proposition, the government points to "production sheets" in evidence and the testimony of Durbin and Hobbs. Although the testimony and the production sheets establish that Durbin received payments equal to approximately 20% of his sales, this evidence is not inconsistent with DeSantis's contention that the *source* of half the funds was not the investors' money. That is, the government has not argued that it produced at trial evidence that investor funds were funneled through DeSantis's personal account and then to Durbin, or that less than 90% of the investors' money went into CBLP, or even that CBLP was so grossly overvalued that DeSantis could give away 20% and still make a profit. The only such evidence the government cites is Hobbs's account of a statement allegedly made to him by DeSantis, to the effect that the CBLP offering was not really $5 million, but rather $4 million, because Durbin would get $1 million. Hobbs did not, however, testify that he was reimbursed out of CBLP funds for his personal payments to Durbin.

Three additional misrepresentations allegedly occurred in regard to the offering. First, contrary to the information in the PPM, Durbin orally and on a written "fact sheet" represented to investors that the risk related to the offering was moderate to low. Second, he told them that the investment would be highly liquid. Third, he convinced several investors that they, the investors, were "suitable," meaning that they had sufficient assets and experience to qualify for this type of investment, when in reality they were not suitable.

The government contends that DeSantis knew Durbin was making these false representations, and that he induced Durbin to make them by providing an exorbitantly high rate of compensation. Durbin did testify that the information he provided to potential investors was given to him by DeSantis. DeSantis notes, however, that Durbin had promised his assistance in the government's case against DeSantis in exchange for the prosecution's favorable sentencing recommendation regarding Durbin's guilty plea to

mail fraud in connection with this transaction. No investor testified that DeSantis himself had misled them. In fact, a letter was introduced into evidence in which Durbin assured DeSantis that Durbin's sales pitch did not deviate from the PPM. And, by signing the subscription agreement, each investor acknowledged the high risk and illiquidity of CBLP and certified that the investor was able to bear those risks.

Although the parties dispute the genesis of CBLP's eventual collapse, both agree that the ultimate cause was the loss of the bars' liquor licenses. Under Ohio law, a convicted felon may not maintain a significant interest in a business enterprise that holds a liquor license. In September 1989, DeSantis pleaded guilty to two charges of filing a false income tax return—a felony. DeSantis claims that he then ceded his interest in CBLP, as well as actual control, to Hobbs. He further maintains that Hobbs's subsequent personal activities conflicted with his management duties, and that he asked Hobbs to step down as general partner. According to DeSantis, Hobbs at first acceded, but then later wrongfully appropriated CBLP's records and reinstalled himself at the helm of the business. DeSantis contends that Hobbs misappropriated funds from the businesses and failed to pay expenses, and that the limited partners therefore permanently removed Hobbs as general partner. DeSantis testified that in retaliation for being removed as a general partner, Hobbs sabotaged the businesses by falsely representing to the Ohio Liquor Control Commission that DeSantis still controlled the clubs, and by using personal connections to local public officials to shut down the bars for purported code violations. Hobbs and the government counter that DeSantis did, in fact, continue to control the bars in violation of Ohio law, leading to CBLP's bankruptcy.

Whatever the case, investors lost substantial sums due to CBLP's collapse. DeSantis was indicted on five counts of using the mails to execute a scheme to defraud these investors, one count of fraud in connection with the purchase and sale of CBLP securities, and one count of securities fraud relating to another alleged scheme of which he was ac-

quitted. The indictment alleged, as to CBLP, that DeSantis misrepresented the commissions on the sale of partnership interests as being 10%, when he knew they would be 20%; that he made misrepresentations regarding risk, liquidity, and investor suitability; and that he used the mails as a further part of his scheme to defraud by mailing documents to the Ohio Division of Securities.

On appeal, the defendant brings seven assignments of error. We think three of them are clearly dispositive, and we shall address them in turn.

## II.

### SCIENTER ELEMENT OF SECURITIES AND MAIL FRAUD

Before discussing the defendant's specific assignments of error, we address, as a preliminary matter, DeSantis's primary defense that his role in selling interests in CBLP did not violate the securities or mail fraud statutes because his actions were taken in good faith.

■ Both statutes require a specific intent to defraud. *See United States v. Frost,* 125 F.3d 346, 354 (6th Cir.1997) (mail fraud); *Ohio Drill & Tool Co. v. Johnson,* 625 F.2d 738, 740 (6th Cir.1980) (securities fraud); *see also United States v. Boyer,* 694 F.2d 58, 59 (3d Cir.1982) (mail and securities fraud). This means not only that a defendant must knowingly make a material misrepresentation or knowingly omit a material fact, but also that the misrepresentation or omission must have the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission. *See Frost,* 125 F.3d at 354. "[A] scheme to defraud must involve [i]ntentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed." *Id.* (internal quotation marks and citations omitted).

■ Alternatively, the prosecution may prove that the defendant was reckless—that he made "an extreme departure from the standards of ordinary care[ ] [by omitting information] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Sanders v. John Nuveen & Co.,* 554 F.2d 790, 793 (7th Cir.1977) (internal quotation marks and citation omitted); *see Auslender v. Energy Management Corp.,* 832 F.2d 354, 356–57 (6th Cir.1987). In either case, the belief, even if *bona fide,* that no investor will suffer a loss from a knowing or reckless material misstatement or omission is not a defense to securities or mail-fraud charges. *United States v. Stull,* 743 F.2d 439, 446 (6th Cir. 1984). Thus, DeSantis is guilty of fraud if the extra 10% paid to Durbin was material to the transaction and he intended to mislead potential CBLP investors by stating that Durbin's commissions were 10% when he knew them to be 20%, or if he knew or almost certainly should have known that Durbin's additional 10% remuneration would have "assumed actual significance in the deliberations of the reasonable [investor]." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

Issues of materiality in the context being discussed here are normally reserved for a jury. *Id.* at 450, 96 S.Ct. at 2133. In fact, unless no reasonable mind could find a statement or omission to be material, a criminal trial court *must* submit the issue to the jury. *See United States v. Gaudin,* 515 U.S. 506, 511, 115 S.Ct. 2310, 2313–14, 132 L.Ed.2d 444 (1995). Although the Ninth Circuit has indicated that a nondilutive commission is *not* material to a securities transaction as a matter of law, *see McGonigle v. Combs,* 968 F.2d 810, 819–20 n. 8 (9th Cir.1992), we reject that conclusion because we believe that reasonable minds could disagree whether the disclosure of an additional 10% remuneration to a broker, even if nondilutive, would make a difference in a reasonable investor's investment decision.

Thus, in light of the above and the overwhelming evidence that Durbin in fact received, from whatever source, 20% remuneration for his sales of CBLP interests, a jury could return a verdict of not guilty on the

commissions aspect of the government's case only (1) if it found the nondisclosed 10% were not material to the CBLP transaction, or (2) if it credited DeSantis's testimony that he truly did not intend to mislead investors by failing to disclose the extra 10%. The significance of this in DeSantis's trial is the reasonable possibility that the trial court's erroneous admission of evidence and refusal to give a necessary instruction, both of which we discuss below, allowed DeSantis to be convicted without a finding by the jury that DeSantis intended to mislead the investors.

We turn now to the defendant's specific assignments of error.

## A.

## IMPEACHMENT BY EXTRINSIC EVIDENCE

■ In the government's cross-examination of DeSantis, the prosecution sought to impeach his version of why the bars' liquor licenses were revoked. In that effort, the prosecution marked as an exhibit a certified copy of an Ohio Court of Appeals decision affirming the findings of both the Court of Common Pleas and the Ohio Liquor Control Commission that DeSantis had never relinquished control over CBLP as he was required to do. After the defendant acknowledged that the liquor commission found his continuing involvement with CBLP required revocation of the bars' licenses, DeSantis was directed, over his attorney's objection, to read into evidence the text of the appellate decision affirming the commission's findings. DeSantis was not a party to any of these proceedings, but only a witness. The text of the court of appeals decision read by DeSantis included the following passage:

> "[T]hree volumes of transcript in the record and the various exhibits more than meet the requirement that the revocation orders be supported by reliable, substantial and probative evidence. The evidence shows that ... DeSantis never relinquished financial control over CBLP through his control of the primary checking account for CBLP. In April of 1990, he hired the office manager for CBLP and fired her one year later.... He called the

various bars on a regular basis and frequently ordered the transfer of funds from the individual bar checking accounts into the primary CBLP checking account under his control. He participated in monthly meetings to assess the profitability of the various bars. After orchestrating a change of the general partner of CBLP to a person closly [sic] aligned to him.... He collected funds from individual bars and made offers of employment to various management personnel at the bars. He claimed to be the owner and operator of the bars to John Racanelli and offered to retain Mr. Racanelli as an operations manager in April of 1991 after the change of general partners in CBLP."

The district court ruled the above admissible for impeachment purposes, because "the witness has equivocated about why [the liquor licenses] were revoked." In this vein, the prosecutor during his closing argument told the jury to consider

> prior convictions when you make your judgment on credibility. Mr. DeSantis claimed distance from CBLP and the bars, litigated it with the Liquor Commission, court of common pleas, court of appeals. Those forums all found otherwise.

The prosecutor later repeated this argument in his rebuttal.

The evidence relating to the liquor-commission findings was clearly inadmissible. Fed.R.Evid. 608(b) provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, ... may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be *inquired into* on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness....

(Emphasis added.) The prosecution sought to impeach DeSantis's testimony that he had ceded control of CBLP to Hobbs by proving that he had not. In that effort, DeSantis was required to read into evidence the findings of specific instances in which he exercised control over the CBLP bars. Although the prosecutor could probably have asked *the*

*defendant* if the Ohio courts had rejected his claim that he did not control operation of the bars, the prosecutor would have been required to "take the witness' answer," and could not "prove" that DeSantis, in fact, ran the bars himself by introducing extrinsic evidence. *See* 1 McCormick on Evidence § 49 (John William Strong, ed., 4th ed.1992).

The cases cited in the government's brief on this point are inapposite. In *United States v. Hurst,* 951 F.2d 1490, 1500–01 (6th Cir.1991), the prosecution was allowed to question a defendant regarding the particulars of his prior conviction for obstruction of justice. However, no extrinsic evidence was introduced to prove these facts. Similarly, in *United States v. Fulk,* 816 F.2d 1202, 1204 (7th Cir.1987), no extrinsic evidence regarding the revocation of the defendant's chiropractic license was allowed, and in fact the trial court *sustained* an objection to the prosecutor's attempt to impeach the defendant by asking him about the revocation. Although the Seventh Circuit opined that questions regarding the revocation were proper, nowhere does the court indicate that the prosecution could have introduced the lower court's judgment or its findings of fact. *Id.* at 1206.

Here, the actual transcript of the appellate proceedings was not introduced against DeSantis; however, this is irrelevant. The factual findings of a prior adjudication are no less extrinsic, and therefore no less inadmissible, merely because the defendant is required to read them. The prosecutor could have asked DeSantis about the liquor-commission proceedings, but he would be "stuck with" the answer given by the defendant. *See United States v. Frost,* 914 F.2d 756, 767 (6th Cir.1990).

Although my brothers agree that compelling DeSantis to read from the Court of Appeals opinion was error, they indicate in their concurrence that they would rather rely on Fed.R.Evid. 403 for this holding. However, it seems that the specific provision of Rule 608(b), which directly addresses the point at issue here, is preferable to the more general weighing test of Rule 403. True, the evidence had no probative value for anything other than impeaching DeSantis's version of

CBLP's collapse. That is, whether DeSantis did or did not cede control to Hobbs is irrelevant in determining the material issue in the case—whether he intended to mislead investors by representing that Durbin would receive a 10% commission. And, as indicated above, the district court admitted the evidence for the explicit purpose of impeaching the defendant.

I concede that the impeachment value of the evidence may have been substantially outweighed by the danger that the jury would place undue confidence in this judicial finding. However, the fact that the relevance of the evidence of specific instances in which DeSantis appears to have been running the bar business was limited to its tendency to impeach his testimony that he had not is precisely the reason it should have been excluded as extrinsic evidence under Rule 608(b). In other words, the only rational purpose for admitting the text of the Court of Appeals opinion was to prove, "for the purpose of attacking . . . the witness' credibility," "specific instances of the conduct of a witness"; namely, the instances in which DeSantis continued to control the bars after purportedly giving up control.

Consequently, under either Rule 403 or 608(b), it was error to require DeSantis to read the passage from the appellate-court opinion.

### B.

### HOBBS'S TESTIMONY

■ The government also sought to impeach DeSantis by calling Hobbs as a witness. Hobbs testified extensively to his version of the reasons for CBLP's collapse. Over objections, the court allowed the prosecutor to inquire regarding what other persons said to Hobbs for the nonhearsay purpose to "show why [Hobbs] took the action he did."

Q. You were in the thralls of telling me about being approached—

A. By Lee Puckett, who ran the building company which I owned stock in as well and so did Lee. He said that—again nonvoting stock—and he said again that there

is something wrong with the accounts, they weren't adding up the way they should.

. . . .

Q. Were you approached by someone else then very shortly thereafter?

A. I was.

Q. Would you please tell the jury about that.

A. I drove down to where the Campus Businesses, Limited Partnership offices were in the university area. As I got out of my car at 11th and High, I was approached by John Raccanelli and Tony Warner, our directors of operation of the business down there.

They said they wanted to talk to me and I said fine, let's go up to the office to talk. They said no. They wanted to discuss—

MR. LUTHER: Objection to what these persons wanted to discuss.

THE COURT: Overruled.

A. They wanted to discuss whatever they had to say to me in the parking lot. At that time they proceeded to tell me DeSantis had been stealing.

MR. LUTHER: Objection.

THE COURT: Mr. Luther, I believe we had a bench conference where you had a continuing objection and the Court will note that for the record and you don't have to get up every time.

MR. LUTHER: Thank you.

THE COURT: You may proceed, Mr. Hobbs.

A. They proceeded to tell me at that time that DeSantis had been stealing money out of the C.B.L.P. businesses, the bars, specifically;

That he had been—that he would call down to the office of C.B.L.P., have the secretary or office manager write a check out of whatever companies of the bars, and then either come down himself or have his secretary come down and pick the checks up.

In addition to that, he was taking cash out of the door money on a more than one time a week basis. Door money being the cover charge when people came into the bars.

Q. How long after Lee Puckett had talked to you were you approached by Raccanelli and Warner?

A. A matter of a couple of days, maybe.

Q. Not withstanding [sic] that, when they told you this about Mr. DeSantis, at the time that they told you, did you believe them?

A. Well, I can't imagine—I can't imagine why they would tell me that, knowing that DeSantis and I were partners, close friends and that would have—it caused me enough concern that at that point in time I contacted a law firm and took Puckett and secured the books from the building company and the books from C.B.L.P. and handed them over to the law firm of Bricker & Eckler who, in turn, hired a CPA firm, Levin and Associates, I believe, who did an audit and the result was that—

MR. LUTHER: Objection, Your Honor. The results of an audit?

THE COURT: Overruled.

A. The result was that the accountant's audit revealed that Mr. DeSantis had been misappropriating funds from C.B.L.P., as well as the building company.

As previously discussed, extrinsic evidence consisting of Hobbs's claim that DeSantis continued to control the bars would be inadmissible under Fed.R.Evid. 608(b) if offered solely for impeachment value. And, his testimony that others told Hobbs that DeSantis was stealing from the bars would be hearsay if offered for the truth of this statement. The government attempts to avoid these difficulties by arguing that Hobbs's testimony was not for impeachment or to prove that DeSantis was taking CBLP money, but to explain "why [Hobbs] took the action he did" in changing CBLP's accounts and removing its books. According to the government, this is relevant to "rebut" the defendant's argument that Hobbs stole CBLP money. However, we do not believe there is any significant difference between evidence introduced to impeach a witness' credibility and evidence introduced to rebut a witness' account of events when the evidence has no value as rebuttal. In other words, the evidence that the government maintains is admissible to rebut the defendant's claim that CBLP's fail-

ure was due to factors other than the alleged fraud, actually supports that claim.

Although the relationship between ultimate investor loss and a defendant's initial intent to defraud is weak, the difficulty of proving a defendant's specific intent requires trial courts to grant the prosecution latitude in the evidence it offers in this regard. *See United States v. Copple*, 24 F.3d 535, 545 (3d Cir.1994). Thus, the government was properly permitted to introduce evidence of investor loss as going to the issue of DeSantis's specific intent to defraud. Similarly, however, a defendant should be granted equal flexibility in showing that the losses were *not* caused by the alleged fraud. *Id.* at n. 16. Therefore, DeSantis's testimony regarding Hobbs's alleged sabotage was also correctly allowed in rebuttal.

■ However, when viewed in its proper light, Hobbs's subsequent "counter-rebuttal" testimony has no relevance whatsoever when offered to challenge DeSantis's claim that the investor losses were due to factors other than fraudulent representations at the time of sale. Hobbs's testimony *supports* the defendant's contention that CBLP failed for reasons other than because the interests were overvalued or diluted. Boiled down, the *only* rational reasons the prosecution could have offered Hobbs's testimony were for its effect as bad-character evidence or to impeach DeSantis's credibility. Neither of these would be a proper basis for admission in light of Fed.R.Evid. 404 and 608. Thus, it was an abuse of discretion to allow Hobbs's testimony in this regard.

### C.

### PROPOSED JURY INSTRUCTION

■ Also during trial, a witness was allowed to read into evidence Ohio Revised Code § 1707.03(Q), which exempts from registration the sale of any security in which the aggregate commission, discount, or other remuneration paid or given directly or indirectly does not exceed 10% of the initial offering price. Because the statute of limitations for prosecution under this law had expired and its relevance was unclear, defense counsel objected several times to the admission of the statute's contents. His objections were overruled. Additionally, at the end of trial, defense counsel requested an instruction clarifying that the "specific intent required under the mail fraud statute is the intent to defraud, and not the intent to violate a [state] statute." This requested instruction was refused. Later, during deliberations, the jury foreman returned a note that read, in part: "I must see the language that is about 'and other remuneration' does not exceed 10 percent." Again, the defendant's request for a cautionary instruction was denied, because the court found the cases cited by his counsel to be inapplicable. Instead, the court reread the statute to the jurors and provided copies. Sixty-six minutes later, the jury returned a verdict convicting DeSantis on all counts of the indictment related to CBLP.

■ A district court's refusal to deliver a requested instruction is reversible error only if the instruction (1) is a correct statement of the law, (2) is not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense. *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991).

As mentioned, DeSantis's primary defense was that he honestly believed he was not required to disclose the extra 10% paid to Durbin because it was neither a commission nor material to the transaction. If his belief was *bona fide*, it would be a defense to the charges against him. DeSantis argues that the jury may have convicted him, even if it believed his testimony as to his good faith, by finding that he "violated" the Ohio statute. That is particularly likely, he argues, since the district court allowed the relevant section of the statute to be read to the jurors not once, but twice, and in addition the jury specifically inquired about the statute.

■ The Ohio statute limits commissions and *other remuneration*, paid directly *or indirectly*, to 10%. The jurors received no explicit caution that it could not convict the defendant of the federal charge merely because he knowingly violated Ohio law. Furthermore, and more likely, the jury could

have convicted based solely on the Ohio statute if it found that the false representations made to the Ohio Division of Securities pursuant to the registration statute were fraudulent misrepresentations. However, these alleged misstatements were not charged in the indictment as constituting the fraud, but rather only the mailing in furtherance thereof. Thus, we think DeSantis was entitled to an instruction which (1) cautioned the jury not to convict him merely of violating Ohio law, and (2) stated that the intent to violate the Ohio statute did not suffice for intent to commit mail or securities fraud.

Unfortunately, the district court's instructions did not address DeSantis's concern that he might be convicted of fraud solely because he violated the state statute. The proper significance of the Ohio statute was not explicitly mentioned in any fashion within the court's instructions, other than in connection with the reading and rereading of the indictment. The closest the court came to discussing the limited application of the Ohio law was in stating, "I want to emphasize the defendant is only on trial for the particular crimes charged in the indictment." Although the trial court did instruct on good faith, the instruction did not preclude the jury from finding that a knowing violation of the Ohio code satisfied the requirement that DeSantis specifically intended to defraud his investors. We think the district court abused its discretion when it refused to give the defendant's requested instruction or something like it.

### D.

### HARMLESS ERROR

An error in the admission of evidence does not require granting a criminal defendant a new trial unless the error affects "substantial rights." Fed.R.Crim.P. 52(a). Similarly, the failure to give an instruction cautioning a jury not to convict in a federal case based solely on a state violation does not require reversal unless the refusal substantially impairs the defendant's defense. *Williams,* 952 F.2d at 1512. When reviewing for harmless error, however, "[w]e are not concerned ... with whether there was sufficient evidence on which the petitioner could

have been convicted without the evidence complained of." *Fahy v. Connecticut,* 375 U.S. 85, 86, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963). Rather, "[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *O'Guinn v. Dutton,* 88 F.3d 1409, 1461 (6th Cir.1996) (internal quotation marks and citations omitted), *cert. denied* — U.S. ——, 117 S.Ct. 742, 136 L.Ed.2d 681 (1997), *and cert. denied* — U.S. ——; 117 S.Ct. 754, 136 L.Ed.2d 690 (1997).

As we indicated previously, the evidence is overwhelming that DeSantis remunerated Durbin at a 20% rate. However, this does not necessarily make DeSantis guilty of mail and securities fraud. The government must also prove beyond a reasonable doubt that DeSantis intended to defraud his investors by representing that Durbin would receive only 10%.

We note that, although DeSantis's conviction could have rested on the alleged misrepresentations regarding risk, liquidity, and suitability, the evidence of these contentions is far from conclusive. No investor said DeSantis had misled him, and Durbin had at one point assured DeSantis in writing that his representations tracked the PPM. Further, the investors signed documents attesting to their own "suitability" as investors and to the fact that they understood the high risk and illiquidity of CBLP. If the defendant's convictions were based solely on these latter grounds, there would be no question that the district court's errors had a reasonable possibility of tipping the scales in favor of the prosecution. Moreover, the record clearly demonstrates that the heart of the government's case was *DeSantis's* representations regarding the 10% commissions, not *Durbin's* statements regarding risk, liquidity, and investor suitability.

Thus, DeSantis's credibility was central to his defense. If the jury was persuaded that DeSantis truly believed the representations in the PPM regarding Durbin's compensation were not misleading, it is likely that DeSantis would have been acquitted. That is, if the jury were convinced that DeSantis believed the extra 10% were not commissions, and that not disclosing the extra 10% was not

intended to mislead the investors, then he would not have the specific intent to defraud. Under the evidence, the jury was entitled to find that the extra 10% were nondilutive, and the jurors therefore could have reasonably also believed DeSantis's contention that he did not think he had to disclose this nondilutive 10% to his investors.

Thus, the evidentiary errors committed by the trial court were likely prejudicial. The factual findings by the Ohio Court of Common Pleas and the Ohio Liquor Control Commission, as adopted by the Ohio Court of Appeals laying out specific instances of DeSantis's exercise of control—contradicting his claim to have ceded control—directly undermined DeSantis's credibility. Although DeSantis admitted that the Ohio Liquor Control Commission and appellate courts had rejected his claim to have given up control of CBLP, the effect of this admission pales in comparison to the reading of a court's detailed factual conclusions. The prosecution's reliance on these appellate findings during closing argument further establishes their importance in undermining DeSantis's credibility. In exactly the same manner, Hobbs's inadmissible testimony regarding the CBLP employees' allegations of embezzlement, and the audit purportedly confirming such embezzlement, undermined DeSantis's credibility, may have prompted the jury to engage in bad-character reasoning, and easily could have affected the jury's verdict.

█ If these two errors did not prejudice the defendant's trial, surely the refusal to give the requested jury instruction did. Not only did the defendant request it before deliberations began, but again after the jury had asked for the text of the Ohio statute. Defense counsel's repeated attempts to prevail on this point indicate its importance. Also, the jury's sole communication during deliberation—asking for the state-law reference to " 'and other remuneration' does not exceed 10 percent"—almost certainly evidences the jury's reliance in some respect on Ohio law. The note's emphasis on the "and other remuneration" language signals that the jury may have believed DeSantis that the extra 10% were not commissions, but convicted him anyway because they were clearly "other remuneration." Under the circumstances it would seem that the failure to give the instruction, particularly the second time it was requested, substantially impaired DeSantis's defense. The fact that the verdict *may* have rested on appropriate grounds does not change this outcome, especially in light of the repeated references the prosecution made to the Ohio statute and to the PPM information regarding the commissions.

### III.

Hobbs's inadmissible testimony and the inadmissible Ohio appellate decision must have weighed heavily on DeSantis's credibility and undermined his claim that the nondisclosure of the extra 10% was not intended to mislead investors. The admission and rereading of the Ohio statute capping remuneration at 10% virtually invited the jurors to impermissibly reason that the intent to violate the statute sufficed as proof of intent to defraud investors. It is more than reasonably possible that one or more of these errors prejudiced DeSantis's trial.

For these reasons, the defendant's judgment of conviction is **REVERSED**.

DAVID A. NELSON, Circuit Judge, concurring.

I concur in the judgment and in all but Part II A of this court's opinion. Part II A concludes that in requiring the defendant to read the jury the text of the Ohio court of appeals decision, the district court violated Rule 608(b), Fed.R.Evid. This may be so, but I would not reach the applicability of Rule 608(b). It seems to me that the evidence ought to have been excluded under Rule 403 in any event.[1] See *Nipper v. Snipes,* 7 F.3d 415, 418 (4th Cir.1993).

---

1. Rule 403, Fed.R.Evid., provides in part that

"[a]lthough relevant, evidence may be excluded

if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...."