NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0766n.06
Filed: October 17, 2006

Case No. 05-3267

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| SE KEUN OH, a.k.a. JIMMY OH, | ) | DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| ――――――――――――――――――――― | ) | |
| | ) | |
| | ) | |

BEFORE:  BATCHELDER, GRIFFIN, Circuit Judges; and ZATKOFF, District Judge.[*]


   **ALICE M. BATCHELDER, Circuit Judge.**  Defendant-Appellant Se Keun "Jimmy" Oh

("Mr. Oh") was indicted on charges of wire fraud in violation of 18 U.S.C. § 1343 (Counts 1, 2 and

3) and making false statements with regard to several government contracts for military parts, in

violation of 18 U.S.C. § 1001(a) (Counts 4, 5, 6 and 7).  The jury acquitted him on Count 4 and

convicted him on all other counts, and Mr. Oh appeals, claiming that the evidence was insufficient

to support his conviction on Count 1and that the district court erred in permitting the jury to consider

certain evidence to which Mr. Oh timely objected.  Finding no error in either regard, we **affirm** the

conviction.

――――――――――――――――

   [*]The Honorable Lawrence P. Zatkoff, Senior United States District Judge for the Eastern District of Michigan,
sitting by designation.

On September 1, 2004, a federal grand jury issued a seven-count indictment against Mr. Oh and the companies that he owns, Euclid Machine, Inc., and Forex Inc., d.b.a. KMT Eastern Machine Tool Co. Count 1 charged Mr. Oh and Euclid Machine with wire fraud involving a contract to provide to the Air Force T-38 aircraft brakes, in violation of 18 U.S.C. § 1343. Count 2 charged Oh and Forex with wire fraud concerning contracts for twelve housing assemblies for use on Air Force KC-135 aircraft, in violation of § 1343. Count 3 charged Oh and Forex with wire fraud concerning seventy KC-135 housing assemblies, in violation of § 1343. Count 4 charged Oh and Euclid Machine with making false statements regarding "shot-peening" of four hundred axles for Army Black Hawk helicopters, in violation of 18 U.S.C. § 1001(a). Count 5 charged Oh and Euclid Machine with making false statements regarding shot-peening for six hundred Black Hawk helicopter axles, in violation of 18 U.S.C. § 1001(a). Count 6 charged Oh and Forex with making false statements regarding twelve KC-135 housing assemblies, in violation of § 1001(a). Count 7 charged Oh and Forex with making false statements concerning seventy KC-135 housing assemblies, in violation of § 1001(a).

Mr. Oh was convicted by a jury on Counts 1, 2, 3, 5, 6, and 7, and acquitted on Count 4. He filed a timely Motion for Acquittal and Motion for a New Trial on Counts 1 and 5, which were denied. The district court sentenced Mr. Oh to concurrent terms of 28 months in prison for Counts 1, 2, and 3, and 28 months in prison for Counts 5, 6, and 7, and payment of restitution in the amount of $172,201.46. This timely appeal followed.

## I. Factual Background

Mr. Oh's companies produce and provide various parts, primarily for the United States military. Between 2002 and 2004, the federal Government awarded Mr. Oh's companies seventy-

2

eight manufacturing contracts. In 2004, the Government began scrutinizing many of these contracts; with respect to three of them, the Government found irregularities that warranted criminal prosecution. Under the first of these contracts, Mr. Oh was to produce speed brakes for the Air Force's T-38 aircraft. The second contract called for Mr. Oh to supply the rear landing axles for the Army's Black Hawk helicopter; and the third contract required Mr. Oh to provide another Government contractor, Western Pacific Enterprises, with housing assembly castings for the Air Force's KC-135 aircraft.

Defense procurement contracts for military parts are typically awarded to a prime contractor and often involve subcontracting for processing, parts, or finishing. These procurement contracts include the requirement that the contractor certify that the parts meet all of the specifications of the contract. The Defense Department relies upon the accuracy of the contractors' certifications and without the necessary certifications a contractor cannot sell its parts to the military. Once a contractor has material ready for delivery, the contractor must coordinate an inspection visit with the Defense Contract Management Agency (DCMA). Inspectors examine procured parts and either accept or reject them using standardized DD-250 forms. The DD-250 form shows that the material was inspected and accepted by an authorized Government official. After a DCMA inspector approves a product, it can then be sent to the customer.

If a customer discovers that the parts do not conform to specifications, a complaint may be issued and several remedial steps taken. If the Government ultimately determines that the products are non-conforming, it may terminate the contract "for convenience," which means that the Government refuses to accept further products or to remit further payment, but does not necessarily

3

pursue restitution against the contractor. Often when the Government terminates for convenience, it simply scraps the products.

## A. T-38 Talon Speed Brakes

Count 1 of the indictment involved a 2003 contract between Mr. Oh and the Government calling for Oh to provide the military with forty-six aircraft speed brakes for the T-38 Talon. These were brakes that Mr. Oh had left over from two earlier contracts. The Government alleged that Mr. Oh represented and certified that the speed brakes complied with Government specifications despite his knowing that they did not. The Government further alleged that the speed brakes had been rejected earlier as non-conforming, and that Mr. Oh resold them to the Government over a decade later, trying to pass them off as conforming parts.

The history of these particular speed brakes goes back to 1988, when Mr. Oh received two Government contracts to supply the Air Force with speed brakes for its training jet, the T-38 Talon ("The T-38 contracts"). The first contract required Mr. Oh to produce the left speed brakes at an approximate total cost of $670,000, and the second contract was for production of the right speed brakes for approximately $700,000. Mr. Oh subcontracted with Cast Right, a Texas-based company, to produce the brakes.

Cast Right produced the speed brakes casting, and Euclid Machine's former quality manager, Boyd Taylor, examined them. Taylor could not measure the brake's contour and began developing a computer program to do so. Taylor never completed the program, but was able to take preliminary measurements that showed the brakes to be "consistently out of tolerance," that is, they did not meet the Government specifications. Taylor informed Mr. Oh of the findings before shipping the parts to the Air Force. Euclid Machine then asked for certification from Cast Right, and Cast Right

4

complied. However, Taylor still could not confirm that the parts met the Government specifications and refused to "sign off" on the parts' being "accurate." Taylor testified that Mr. Oh responded to the problem by saying, "well, we'll use a certificate of conformance of Cast Right to prove that the parts were correct." Mr. Oh then assigned Taylor to the company's "inspection room" to finish the computer program that he had started. Shortly thereafter, Taylor was fired.

In 1991, Euclid Machine prepared to ship the speed brakes to the Air Force. The company completed the DD-250 forms indicating that a Government quality assurance specialist had inspected and signed off on the parts. Jim Hartman, one of the Government's quality assurance specialists, testified that he signed off on some of these forms in January 1991. He stated that in early 1991 he arrived at Euclid Machine intending to meet with Taylor to verify the contour data on the speed brakes. When Hartman arrived, Mr. Oh told him that Taylor was no longer with the company. Hartman stated that he still wanted to validate the contour data and that he knew Taylor had been creating software to test the brakes' contour data. Hartman testified that Mr. Oh responded that Taylor had been upset and had "wiped out the software." Taylor, however, denied wiping out the software and testified that he had left it with Euclid Machine. In any event, without the computer program, Hartman signed off on the DD-250 report, relying on the certification provided by Cast Right. The DD-250 report enabled Euclid Machine to ship the speed brakes to the Air Force.

Euclid Machine began shipping the T-38 speed brakes to Kelly Air Force Base (KAFB) in 1991. After Euclid Machine had shipped approximately 70% of the speed brakes for which the Government had contracted, KAFB filed a product quality deficiency report ("PQD report") stating that it was rejecting the speed brakes because they did not fit properly. Hartman provided Mr. Oh with the PQD report and made repeated attempts to persuade Oh to evaluate the brakes and to

resolve the problem, but Mr. Oh refused, insisting that the brakes conformed to the contract specifications. Hartman testified that, in his experience, this was very unusual for a contractor.

KAFB then agreed to host a meeting with Mr. Oh so that, together, the parties could determine the source of the problem. Hartman and Mr. Oh's brother, Dustin Oh, attended the meeting, which, according to Hartman, began with Air Force officials' asking Dustin Oh to explain how Euclid Machine had inspected the product and found it within specifications. Dustin Oh refused to answer, stating that he was there to get answers from them, not to give answers. Air Force officials then showed Dustin Oh how they had inspected and tested the product and found it unacceptable. They again asked Dustin Oh to explain how Euclid Machine had reached the opposite conclusion, but Oh refused to cooperate. After this meeting, despite having already received and paid for 70% of the non-conforming speed brakes, the Air Force terminated the contract for convenience and kept the parts already received, allowing Mr. Oh to keep the money already paid. The Government refused to accept or pay for any additional parts under the contract on grounds that the parts did not conform to contract specifications.

Some years later, the Air Force sold to Alamo Aircraft six of the speed brakes that Mr. Oh had provided KAFB under the 1988 contract. At trial, the parties stipulated that the Government sold these parts to Alamo Aircraft as "surplus," thereby indicating that the brakes in fact met Government specifications. The Government conceded that the "surplus" label was a mistake. In 2002, Alamo Aircraft sold these same brakes back to the Government. Mr. Oh learned of this transaction, contacted Alamo Aircraft, confirmed that the Government had sold the parts as surplus and that Alamo Aircraft then sold them back to the Government as good parts.

6

In 2003, the Air Force solicited new contract bids for T-38 speed brakes. With an inventory of speed brakes that the Air Force had rejected in the early 1990s, Mr. Oh submitted a bid to supply forty-six speed brakes for $2300 each, and stated that he could deliver the parts in forty-five days. Charles Hall, a Government procurement agent, testified that the only other bid from an approved manufacturer was for $15,000 per part, and that they could not be delivered for two hundred and seventy days. Hall asked Mr. Oh how he could provide the parts so quickly, and Mr. Oh replied that the parts were remnants of the 1988 contract. At Hall's request, Mr. Oh provided the contract number from the 1988 contract and faxed to Hall the original DD-250 forms for the 1988 parts.

The DD-250 forms that Mr. Oh sent Hall represented that Euclid Machine had manufactured and delivered several sets of air brakes, and that they had been inspected and accepted by the DCMA in February 1990 and January 1991. Hall testified that he took this to mean that they were good parts. Hall also testified that the DD-250s represented that Mr. Oh offered the parts as good material. The Government investigated the earlier T-38 contract and discovered two minor quality deficiency reports, and a technician researched the contract history and found no negative remarks as to quality. Only later did the Government discover that these parts suffered from the same contour non-conformance problems as the earlier speed brakes.

### B. Black Hawk Helicopter Rear Landing Axles

Counts 4 and 5 of the indictment concern a second contract, solicited and obtained by Euclid Machine in June 2002, to provide the Government with rear landing axles for the Black Hawk Army helicopter. Under the contract, Euclid Machine was to provide two thousand axles. The axles were to have undergone a hardening process known as "shot-peening" in which a metal part is pelted with small BBs to increase the part's fatigue strength without increasing its weight. Shot-peening cannot

7

be visually detected on a finished part; it can be discovered only by cutting the part open. The Government alleged that Mr. Oh represented that the axles he eventually provided had been shot-peened, when, in fact, he knew that they had not.

Euclid Machine subcontracted the axle manufacturing to McNeil Industries. According to Justin McNeil, the director of operations for McNeil Industries, this was McNeil Industries's first Government contract, and the company was unfamiliar with how the system worked. Mr. Oh met with McNeil Industries representatives to explain how to manufacture the axles based upon the Government specifications. In August 2002, Oh provided McNeil Industries with a document detailing the Government specifications for the axle parts, but this document did not contain all of the information necessary for making the part. In particular, this document omitted the shot-peening requirement. A second document, not delivered to McNeil Industries until December, specified the shot-peening and contained all of the necessary specifications. However, between September and December 2002, McNeil Industries had some four hundred axles manufactured, using other subcontractors pre-arranged by Mr. Oh. According to Justin McNeil, those axles were heat treated, cadmium plated, and chrome plated as per the original specifications, but they were not shot-peened because McNeil Industries was unaware that the contract contained any shot-peening requirement.

In late November 2002, McNeil Industries delivered approximately four hundred of the contracted axles to Mr. Oh. On November 27, 2002, Euclid Machine shipped 400 axles to the DCMA, certifying in the shipping documents that the parts conformed to the contract requirements, including shot-peening. Justin McNeil testified that Mr. Oh called him on December 2 and asked for certification for the shot-peening. Justin McNeil said that he told Mr. Oh both that the delivered parts were not shot-peened, and that the price he had quoted Mr. Oh for the parts had not included

8

shot-peening because he was not aware that the contract required it. Shot-peening would have cost McNeil Industries an additional $1.50 per part to perform initially, and would have cost far more to perform after the chrome and cadmium plating had been applied. Following this conversation, Mr. Oh faxed McNeil Industries the second document detailing the axles' manufacturing process and indicating the shot-peening requirement, and told Justin McNeil to shot-peen the remaining parts. On learning that more than five hundred of the remaining six hundred parts were already chrome plated and would have to be stripped and redone in order to shot-peen them, Mr. Oh told McNeil that he would arrange for the shot-peening of those parts, and that McNeil Industries should ship the remaining eighty-six unchromed parts to Atom Blasting, another subcontractor.

During his cross-examination by the Government, Mr. Oh disputed Justin McNeil's testimony. Mr. Oh testified that he never provided the Government with certifications that the shot-peening had been performed on the first four hundred parts sent by McNeil Industries, but that as the primary Government contractor it was his responsibility to maintain the certifications. Oh maintained that he received certification from McNeil Industries that the other six hundred parts had been shot-peened, and although he could not produce evidence of this, he claimed that he thought "it is an exhibit or document" that he had already provided. He denied knowing in early December that the first set of parts had not been shot-peened, and he also denied knowing that the vast majority of the last six hundred parts were never shot-peened. Mr. Oh testified that it was not until he was indicted in this case that he first learned that the parts were not shot-peened.

The Government charged Mr. Oh in Count 4 with making false representations regarding shot-peening for the initial shipment of four hundred axles, in violation of 18 U.S.C. § 1001(a), and

9

in Count 5 with falsely representing that six hundred axles had been shot-peened, also in violation of 18 U.S.C. 1001(a).

## C. KC-135 Housing Assemblies

Counts 2, 3, 6, and 7 of the indictment charge that Mr. Oh committed wire fraud and made false representations with regard to a contract that Mr. Oh had with Western Pacific Enterprises ("WPE"), another Government contractor, to manufacture the aircraft "housing assemblies" for the Air Force's KC-135 Stratotanker fueling plane. In November 2002, the Government awarded WPE a defense contract to provide housing assemblies for the KC-135 aircraft. The contract specified that a casting was to undergo fluorescent penetrate testing and x-ray testing. The Government alleged that Mr. Oh misrepresented to WPE that the requisite testing had been performed and that he falsified the certification documents in an attempt to prove it.

At trial, WPE president, David Capulopo, testified that the parts he received on March 12, 2003, were not stamped and could not have been inspected. Capulopo testified that on March 21, 2003, Mr. Oh had faxed him certifications which indicated that the parts had been tested on March 10, 2003. Christian Scheel, an inspector with the Advanced Quality Group whose signature appeared on the certification, testified that he had not performed the testing on March 10, but had done so on March 20. Scheel testified that Mr. Oh admitted to him that he had forged and falsified the certification.

The Government also produced evidence that Mr. Oh had provided a report purporting to be from U.S. Inspection Services, indicating that testing had been performed on 15 parts. A U.S. Inspection Services employee testified that the company had no record of ever completing such a report, and the Government contended that Mr. Oh forged the report.

Prior to trial, Mr. Oh sought to plead guilty to the counts involving the housing assembly contracts, Counts 2, 3, 6, and 7, maintaining that his intention had not been to defraud WPE or the Government, but to prevent WPE from learning the identity of Oh's supplier. The district court rejected the plea because Mr. Oh would not admit to all of the elements of the offenses charged in those counts, and Mr. Oh proceeded to trial. He was found guilty on Counts 1,2,3,5,6 and 7.

Although presented as four separate assignments of error, Mr. Oh's appeal advances two basic arguments. First, Mr. Oh claims that the trial court erred in denying his Motion for Acquittal as to Count 1because the Government presented insufficient evidence to support his conviction for wire fraud as charged in that count. Second, Mr. Oh claims that he was prejudiced by certain evidence that the district court erroneously permitted the jury to consider, and his Motion for a New Trial on Counts 1 and 5 should therefore have been granted.

## II.

### A. MR. OH'S MOTION FOR ACQUITTAL

We review *de novo* a district court's denial of a motion for acquittal. *United States v. Keeton*, 101 F.3d 48, 52 (6th Cir. 1996). We "must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id*. (emphasis original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L.Ed. 2d 560 (1979)).

The wire fraud statute, 18 U.S.C. § 1343, provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings,

11

signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

To obtain a conviction of Mr. Oh for wire fraud, the Government needed to prove "(1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property." *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003); *see also United States v. Prince*, 214 F.3d 740, 747-48 (6th Cir. 2000).

Although the second element is uncontested, and is easily satisfied by Mr. Oh's faxing of three DD-250 forms to Charles Hall, Mr. Oh contests the sufficiency of the evidence to prove the first and third elements of wire fraud. He argues that the Government failed to show that he "developed a scheme to defraud the Government" or that he "intended to defraud the Government of money or property." We disagree.

The district court concluded that as to the first element, a scheme or artifice to defraud, the Government presented sufficient evidence to prove that Mr. Oh knew that the speed brakes he supplied pursuant to the 2003 contract did not conform to the Government's specifications and that he deliberately kept this information from the Government. The Government put on evidence that included testimony that Mr. Oh received letters from military officials explaining the problems with the speed brakes; testimony regarding the meeting at Kelly Air Force Base with Mr. Oh's brother in which officials explained how the brakes failed to conform to the Government's specifications; and Boyd Taylor's testimony that he told Mr. Oh that the parts were out of tolerance even before they were shipped the first time. From this evidence a rational jury could conclude that Mr. Oh intended to sell to the Government brakes that he knew did not meet the contract specifications.

12

The district court also concluded that the jury had sufficient evidence to determine that under the 2003 contract Mr. Oh intentionally withheld information from the Government regarding the defects in the brakes. The jury heard that Mr. Oh did not inform Mr. Hall that in 1991 Kelly Air Force Base had issued a product quality deficiency report indicating the brakes' non-conformance or that the Government had terminated the 1988 contract because the parts did not meet the contract specifications.

Mr. Oh argues that the jury lacked sufficient evidence to convict because he disclosed the 1988 T-38 speed brake contract number on his 2003 bid for the speed brakes contract. He maintains that both he and Charles Hall understood that the only reason that Mr. Oh could deliver the speed brakes so rapidly and so cost effectively was because he had spare brakes from the 1988 contract. Mr. Oh claims that he provided the Government with all of the information it needed to determine if there were any problems in accepting his bid for parts that he admitted he manufactured pursuant to the 1988 contract. He contends that he made no false statements or material misrepresentations that would have misled the Government about the parts.

We have some sympathy with Mr. Oh's implicit contention that the Government failed to undertake the kind of investigation that would have revealed the entire history of these speed brakes. We conclude, however, that because Mr. Oh's failure to disclose a material fact to the Government constitutes a misrepresentation for purposes of the wire fraud statute, the Government's failure to investigate is not material to the issue of Mr. Oh's guilt. In *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998), we held that in the fraud context an affirmative misstatement is not required. Rather, a scheme or artifice to defraud may simply involve a knowing omission of a material fact. *Id*. To be sure, that knowing omission "must have the purpose of inducing the victim of the fraud

13

to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission." *Id*. The district court relied on *DeSantis*, and concluded that from the evidence presented at Mr. Oh's trial, a rational factfinder could reasonably have believed that Mr. Oh deliberately sought to conceal material information from the Government when he failed to provide the results of subsequent product quality deficiency reports, that he misled the Government by omitting this information, "the one piece of information that likely would have affected the government's choice whether or not to accept Mr. Oh's bid."

We find no error in the district court's conclusion that the jury's verdict on Count 1 is supported by sufficient evidence.

## B. Mr. Oh's request for a new trial

Mr. Oh argues that he should have been granted a new trial on Counts 1 and 5 because of the admission of prejudicial evidence during his trial. The district court denied Mr. Oh's motion and we affirm.

Mr. Oh offers three reasons that a new trial should have been granted: (1) the admission of evidence concerning prior contracts not at issue in this case prejudiced Mr. Oh; (2) James Stec's testimony prejudiced Mr. Oh, despite the court's instruction that the jury disregard the testimony; and (3) because the court rejected Mr. Oh's guilty plea as to Counts 2, 3, 6, and 7, the jury heard facts and circumstances of charges that Mr. Oh did not dispute.

First, Mr. Oh argues that the district court improperly admitted testimony regarding earlier contracts related to bell housing tanks and Inconel parts, which were not part of this indictment. Mr. Oh contends that the testimony of James Hartman and Boyd Taylor was admitted in violation of Federal Rule of Evidence 404(b), and that he was unfairly prejudiced by this testimony because it

14

tended to confuse the jury. Mr. Hartman testified *inter alia* that in inspecting a Euclid Machine contract to supply the Government with bell housings, he discovered that the parts did not meet the Government's specifications, even though the parts had been previously inspected, provided with a DD-250 form, and were ready to be shipped. He testified that when he informed Euclid Machine, the company conducted further testing and terminated the contract when the parts continued to fail the tests. Mr. Taylor testified to an incident involving replacements for Inconel parts. According to Taylor, Mr. Oh wanted to buy non-certified material to use in the parts, and when Taylor informed him that using the non-certified material would violate the contract, Mr. Oh replied: "How are they going to know?"

Under Rule 404(b), evidence of other acts is "not admissible to prove the character of a person in order to show action in conformity therewith . . . ." But evidence of other acts is admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." FED.R.EVID. 404(b). The Government introduced testimony of Hartman and Taylor to demonstrate that Mr. Oh had a working knowledge of the certification process and the need to produce parts that comply with Government specifications, and that he understood that there were ways to deceive the Government by using non-conforming material. The district court properly instructed the jury that it could consider the testimony only to the extent that it provided evidence that Mr. Oh did not make a mistake in how he handled the T-38 speed brakes, but that he was well aware of the Government's process for buying parts and demanding specification compliance. We find no error here.

Second, regarding James Stec's testimony, Mr. Oh argues that he was unfairly prejudiced because the jury heard some of Stec's testimony before the district court judge determined that the

testimony was inadmissible. Stec testified that Mr. Oh had asked him to backdate a gauge to reflect a particular thermometer calibration in order to show that a part had been tested under proper conditions of temperature and humidity. The court ruled the testimony inadmissible and instructed the jury to disregard Stec's testimony. Mr. Oh now argues that the jury was likely unable to disregard the testimony, and that he was therefore prejudiced. The Supreme Court has determined that courts should "presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is 'overwhelming probability' that the jury will be unable to follow the court's instructions." *Greer v. Miller*, 483 U.S. 756, 767 n.8 (1987). Mr. Oh has failed to demonstrate anything resembling an "overwhelming probability" that the jury could not follow the court's instruction, and the district court did not err in denying a new trial on this ground.

Finally, Mr. Oh argues that he was prejudiced because the jury heard additional, "spillover" evidence about his culpability as to the counts in his indictment to which he attempted to plead guilty. This evidence pertained to the 2003 contract to provide KC-135 housing assemblies to WPE, and the doctored certifications that suggested that testing had taken place on particular dates when it had not. The district court rejected Mr. Oh's guilty plea after determining that he had not actually acknowledged his guilt. Fed. R. Crim. Proc. 11. This contention is meritless. The district court properly determined that in light of Mr. Oh's insistence that he had not intended to defraud the government, pleas of guilty to these four fraud counts were inappropriate. The Government was therefore entitled to present the evidence relative to these counts to the jury. The court did not err in denying a new trial on these grounds.

## CONCLUSION

Accordingly, we **AFFIRM** the judgment of the district court.

16